UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

EVERETT CHARLES WILLS II          CIVIL ACTION 5:17-CV-00753

VERSUS                            JUDGE HICKS

STATE OF LOUISIANA                MAGISTRATE JUDGE PEREZ-MONTES

## REPORT AND RECOMMENDATION

Everett Charles Wills II ("Wills") filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1).  Because Wills has not carried his burden of proving his habeas claims have merit and that the state courts' denial of his claims was contrary to, or involved an unreasonable application of, clearly established federal law, Wills's petition should be denied.

## I.    Background

Wills is contesting his 2012 conviction on one count of second degree murder by a jury in the Louisiana First Judicial District Court in Caddo Parish.  Wills was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence.  See State v. Wills, 48,469-KA (La. App. 2d Cir. 9/25/13), 125 So.3d 509, writ den., 2013-2563 (La. 6/13/14), 140 So.3d 1184.

Wills raises the following issues for habeas review:

1.    Wills's trial was rendered fundamentally unfair because he was denied the effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments.

2.      Wills's trial was rendered fundamentally unfair as a result of prosecutorial misconduct in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments.

3.      The district court erred when it failed to allow Wills to supplement his application for post-conviction relief and summarily denied his application for post-conviction relief in violation of the Fifth, Sixth, and Fourteenth Amendments.

Wills alleges, and Respondent concedes, that Wills's habeas petition is timely and his claims are exhausted.

The facts of this case, as found by the Louisiana Second Circuit Court of Appeal, are set forth at Wills, 125 So. 3d at 515-17, as follows:

This shooting occurred on the night of April 18, 2011, around 10:30 p.m. The victim, 26–year–old Carlos Guster, was walking in his neighborhood. Zina Guster, the victim's mother, testified that Carlos talked out loud to himself. She testified that she was afraid for the victim's safety and that she sought help from the local coroner's office regarding what could be done to help her son; she was advised that nothing could be done because he was not physically a danger to anyone or himself. She testified that Carlos would carry a little microphone and sing out loud, that he never had any problems with anyone, and that he did not own a firearm.

On the night of the shooting, Carlos stopped at the home of Aleana Johnson, defendant's mother, to speak with defendant's sister, 18–year–old Ellen Johnson. Ellen and her twin sister Emma were at home alone with Emma's son.

Ellen testified that the victim had a crush on her, but that she had spurned his advances. Ellen and her twin sister Emma also testified that the victim had previously cursed at them and their mother, but that he had never physically assaulted them and they had never seen him with a weapon. Specifically, Ellen stated that the victim had never threatened her with a gun, and she had never seen him with a gun. Ellen testified that she had observed the victim talking out loud to himself on several occasions, but she had never reported the victim to the police, nor told defendant about his threats. Similarly, Emma testified that her mother had witnessed the victim's behavior, but that they had never told defendant about the victim's threats.

2

Tondra Johnson, the next door neighbor of Aleana Johnson, testified that she saw the victim walking alone around 10:15 p.m., and that he was talking to himself. She stated that she did not see any weapon. She described the victim as walking on the sidewalk in front of her home, when suddenly defendant, who apparently was dropping his mother off at her home, parked his car in the street and called out to the victim. She testified that defendant's twin sisters were present on their front porch. She heard defendant state "that he wanted to talk to him (the victim)," but there did not appear to be any hostility. She walked into her home and soon heard "popping noises" outside. She and her son Joe went outside and observed defendant standing over the victim. She asked defendant what happened, and defendant stated that the victim had "disrespected his mom's house." She saw a gun in defendant's hands and asked defendant if he was going to leave the victim in her front yard. Defendant then turned around, picked up the victim, and walked across the street to a vacant lot where he dropped the victim's body. Defendant then got in his car and drove off. Joe Johnson, the son of Tondra Johnson, testified that he observed defendant carrying a body to a vacant lot before he drove away.

Charmaine Williams testified that he saw defendant shoot the victim, that he heard numerous gunshots, that he saw defendant trying to unjam " [sic] his gun and then he saw defendant shoot the victim four or five more times while the victim was lying on the ground. He further testified that the girls (presumably the two sisters) were screaming at defendant not to shoot the victim.

Defendant's mother and two sisters testified that the victim was talking to defendant and threatening harm to the sisters before he jumped behind a tree and started to pull something from his pocket. At that point defendant shot Carlos, who fell to the ground. One sister stated that then "my brother was making sure whatever he was trying to get out of his pocket—I don't even know what he was trying to get out of his pocket. But my brother, you know, shot him again." The mother claimed that Carlos told defendant that he was going to f--- those b----- and then kill everyone. The mother was impeached by her recorded statement to the police. She said to the police that she had gone into the house and did not see the shooting. On cross-examination, she admitted that she did not see the shooting but heard it.

Roy Dickerson, a neighbor, did not see the shooting, but heard the shooting and women screaming. He went outside and observed a person carrying another person. Specifically, he stated that he heard the sounds

of gunshots "close together" and looked outside and saw someone standing under the street light. The person under the light then fired twice more down to the ground. Dickerson testified that he saw the shooter stoop and pick up a person.

After the shooting, defendant, who was 35 years old, returned to his home. His wife, Teresa Wills, testified that he was sorry about what happened. She testified that she had previously purchased a gun, a Hi–Point .380, for the protection of her and defendant's family home, but that she had not seen the gun prior to the shooting. The gun was never recovered; however, the holster was recovered from defendant's car.

A record from Brittain's Pawn Shop showed that Teresa Yvette Barnes/Wills purchased on February 12, 2009, a Hi-Point .380 caliber pistol and a Cobra .32 caliber derringer. Two live rounds and six spent cartridges were found at the scene. Richard Beighley, a firearms examiner with the North Louisiana Crime Lab, identified all eight cartridges as .380 caliber. He further noted that the two live rounds had damage consistent with the pistol jamming.

Defendant was interviewed by Sgt. Paul Robinson of the Shreveport Police Department. Defendant, after being given the *Miranda* warnings, agreed to talk. Defendant stated that the victim had been disrespecting his mother and sisters and some type of confrontation ensued. He stated that the victim pulled a gun and that defendant took the gun from the victim and shot him. His statement was played to the jury.

Dr. Long Jin, an expert in forensic pathology, performed the autopsy on the victim. He testified that the victim had six gunshot wounds and other injuries to the right back of the neck and the right upper back, which may have resulted in fragmented bullets hitting the ground. Specifically, Dr. Jin testified that most of the bullets' trajectories were from front to back, left to right and top to bottom. Dr. Jin recovered one projectile. Dr. Jin testified that the cause of the victim's death was multiple gunshot wounds to the head and neck, torso and right upper arm. Dr. Jin also testified that the wounds were consistent with the victim being shot while down on the ground.

## II.    Law and Analysis

### A.    Rule 8(a) Resolution

The Court is able to resolve this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact relevant to the petitioner's claims, and the state court records provide the required and adequate factual basis.  See Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

### B.    Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall be considered only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).  The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judge.  See Davis v. Ayala, 135 S. Ct. 2187, 2202 (U.S. 2015) (citing Harrington v. Richter, 562 U.S. 86, 102–03 (2011).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885 (2001).

Therefore, Section 2254(d) demands an initial inquiry into whether a prisoner's "claim" has been "adjudicated on the merits" in state court; if it has, AEDPA's highly deferential standards kick in.  See Davis, 135 S. Ct. at 2198 (citing Richter, 562 U.S. at 103).

When a federal claim has been presented to a state court and the state court has summarily denied relief without a statement of reasons, it may be presumed that the state court adjudicated the claim on the merits, in the absence of any indication or state-law procedural principles to the contrary.  Richter, 562 U.S. at 99.  A habeas court must determine what arguments or theories supported, or could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.  See Richter, 562 U.S. at 102.  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must be met by showing there was no reasonable basis for the state court to deny relief.  Richter, 562 U.S. at 98.

Pursuant to AEDPA, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2).  See Martin, 246 F.3d at 475-76.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. See Martin, 246 F.3d at 476; see also Rivera v. Quarterman, 505 F.3d 349, 356, cert. den., 555 U.S. 827 (2008).

A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable. See Martin, 246 F.3d at 476. An unreasonable application is different from an incorrect one. See Bell v. Cone, 535 U.S. 685, 694 (2002). When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable. See Mitchell v. Esparza, 540 U.S. 12, 18 (2003); see also Davis, 135 S. Ct. at 2199 (citing Fry v. Pliler, 551 U.S. 112, 119 (2007)).

In § 2254 proceedings, a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993),

whether or not the state appellate court recognized the error and reviewed it for harmlessness. See <u>Fry</u>, 551 U.S. at 121-22. The Court should treat the error as if it affected the verdict, and the State bears the burden of persuasion as to the harmlessness of the error. See <u>Fry</u>, 551 U.S. at 121, n. 3.

### C. <u>Wills did not carry his burden of proving he had ineffective assistance of trial counsel.</u>

#### 1. <u>The law as to ineffective assistance of counsel</u>

To prevail on a habeas complaint of ineffective assistance of counsel, a complainant must meet the two-pronged test set forth by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984): (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. To make that determination, the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. The court does not assess any alleged error in isolation. In an examination of state proceedings under 28 U.S.C. § 2254, the court will not reject an adjudication on the merits unless the action by the state court is found to be contrary to, or an unreasonable application of, clearly established federal law, or the state court's determination of the facts is manifestly unreasonable in light of the evidence. <u>Jones v. Cain</u>, 227 F.3d 228, 230 (5th Cir. 2000), and cases cited therein.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time.  See Dowthitt v. Johnson, 230 F.3d 733, 743 (5th Cir. 2000), cert. den., 532 U.S. 915 (2001) (citing Strickland, 466 U.S. at 689).  Thus, the court's scrutiny of counsel's performance is highly deferential.  The court must be particularly wary of arguments that essentially come down to a matter of degrees, such as whether counsel investigated enough or presented enough mitigating evidence.  Those questions are even less susceptible to judicial second-guessing.  See Dowthitt, 230 F.3d at 743 (citing Kitchens v. Johnson, 190 F.3d 698, 703 (5th Cir. 1999)).

In a habeas proceeding alleging ineffective assistance of counsel, the petitioner has the burden of proof.  See U.S. v. Chavez, 193 F.3d 375, 378 (5th Cir. 1999), citing Clark v. Collins, 19 F.3d 959, 964 (5th Cir. 1994), cert. den., 513 U.S. 966 (1994).

## 2.    Wills had effective assistance of counsel in his manslaughter defense.

Wills contends his trial was rendered fundamentally unfair because he had ineffective assistance of trial counsel.  Specifically, Wills argues his attorney erred in telling the jury he was guilty of manslaughter and adopting the State's unsubstantiated theory that the victim suffered from an undiagnosed mental illness. Wills contends his attorney should have pursued self-defense.

On appeal, the state courts upheld the verdict, finding there was no evidence of provocative acts by the victim, noting that mere insulting or offensive words or gestures cannot reduce homicide from murder to manslaughter.  See Wills, 125 So.3d

9

at 517. The state courts summarily denied Wills's post-conviction ineffective assistance of counsel claim (Doc. 15-11, pp. 58-59/200; Doc. 15-12, p. 281/281; Doc. 15-13, p. 392/393).

A defendant who has been charged and is on trial for homicide and asserts that he acted in self-defense or defense of another does not assume any burden of proof whatever on that issue; the state has the entire and affirmative burden of proving beyond a reasonable doubt that the homicide was not justifiable under the particular circumstances. See State v. Pittman, 428 So.2d 979, 983 (La. App. 1st Cir. 1983), writ denied, 433 So.2d 155 (La. 1983), cert. denied, 464 U.S. 836 (1983). On review, the relevant inquiry is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense of defense of another. See State v. Matthews, 464 So.2d 298, 299 (La. 1985); State v. Woodburn, 94-98 (La. App. 5th Cir. 1994), 643 So.2d 1263, 1265, writ den., 94-K-2457 (La. 1995), 649 So.2d 379.

> In order to justify a homicide, the person who is attacked must reasonably believe that he is in imminent danger of losing his life or of receiving serious personal injury. Such a belief must also be a reasonable one. The danger need not be real but the person attacked must reasonably believe that he is in actual danger. Not only must the person attacked reasonably believe that he is in imminent danger, but he must also reasonably believe that it is necessary to kill in order to save himself.... [A] person's belief that he is in danger of losing his life or receiving serious personal injury is not "reasonable" unless it is founded upon an actual physical attack or hostile demonstration by the deceased.... [I]n order for the homicide to be justifiable, a person who kills another must have a reasonable belief that the killing is necessary.

La. R.S. 14:20 (Reporter's Comment). Factors that should be considered in determining whether the defendant had a reasonable belief that the killing was

necessary are: (1) the possibility of avoiding the necessity of taking human life by retreat; (2) the excitement and confusion of the occasion; (3) the possibility of avoiding the necessity of killing by using force or violence less than killing; and (4) the party's knowledge of the assailant's bad character. See La. R.S. 14:20 (Reporter's Comment); see also State v. Brown, 492-93 (La. App. 3d Cir. 1994), 640 So.2d 488, 492. The defendant's actions after the shooting should also be considered in determining whether the killing was done in self-defense. See Brown, 640 So.2d at 492.

An aggressor or one who brings on difficulty, as a general rule, cannot claim the right of self-defense unless he withdraws from the conflict in good faith and indicates his intention of abandoning the difficulty. See La. R.S. 14:21. Where doubt exists as to whether the accused was the aggressor, the possibility of retreat is only one of many factors for the jury to consider in determining whether the defendant has a reasonable belief that the force employed was necessary. See Brown, 640 So.2d at 492.

There was testimony from three eyewitnesses to the offense – Charmain Williams (Doc. 15-8, pp. 149-154/257); Ellen Johnson (Wills's sister) (Doc. 15-8, pp. 206-212/257); and Ray Dickerson (Doc. 15-8, pp. 162-64). Wills also admitted to two police officers that he had shot the victim (Docs. 15-6, pp. 316, 325/352). The eyewitnesses testified that Wills stopped the victim (who was unarmed, walking away, and talking to himself), spoke to him, shot him six times, then picked his body up and threw it into a vacant lot across the street. There was no evidence that the victim was the aggressor or that he was armed. Instead, Wills initiated the

11

confrontation and did not attempt to withdraw from it.  Therefore, Wills could not have claimed self-defense or defense of another.  Wills's attorney pursued the only viable defense left to Wills, the defense of manslaughter.[1]

Wills has not carried his burden of proving he had ineffective assistance of counsel as to the defense of manslaughter, and that the state courts' denial of his claim was contrary to, or involved an unreasonable application of, clearly established federal law.

### 3.    <u>Wills did not have ineffective assistance of counsel due to his claim of a denial of speedy trial.</u>

Wills contends his counsel was ineffective for failing to pursue his claim that he was denied a speedy trial.  Wills filed a pro se motion for a speedy trial (Doc. 15-5, p. 256/260), although he was represented by counsel.  That motion was argued and denied (Doc. 15-6, p. 210/352).  On appeal, the state courts found the delays in Wills's trial were justified by discovery and other motions, and the gravity of the offense charged, and that any other delays were due to the trial court's docket and calendar and not by bad faith on the part of the prosecutor.  See <u>Wills</u>, 125 So.3d at *14.  The

---

[1] In Louisiana, manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  See La. R.S. 14:31(1); <u>State v. Lombard</u>, 486 So.2d 106, 110–11 (La. 1986).  Thus, the presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder.  "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter.  Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them.  See <u>Lombard</u>, 486 So.2d at 110–11.  Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict.  Where such proof has been introduced, a second degree murder verdict is inappropriate.  See <u>Lombard</u>, 486 So.2d at 110–11.

state courts summarily denied Wills's post-conviction ineffective assistance of counsel claim (Doc. 15-11, pp. 58-59/200; Doc. 15-12, p. 281/281; Doc. 15-13, p. 392/393).

The Sixth Amendment guarantees the right to a speedy trial. In analyzing whether this right has been violated, the Supreme Court in Barker v. Wingo, 407 U.S. 514, 530-32 (1972), adopted a balancing test, in which the conduct of both the prosecution and the defendant are weighed. The Barker court identified four factors for a court to assess: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (3) prejudice to the defendant.[2] See Boyer v. Vannoy, 863 F.3d 428, 441–42 (5th Cir. 2017), pet. for cert. filed, No. 17-7930 (U.S. 2/6/2018).

Wills's criminal case required extensive trial preparation. Testimony was twice perpetuated in advance of trial. There were pretrial hearings on Wills's motion in limine as to autopsy photographs (Doc. 15-6, p. 38/352) and his motion to suppress statements he made to the police (Doc. 15-6, p. 308/352). Also, the State had difficulty locating a material witness, Charmain Williams, which caused a delay (Doc. 15-6, pp. 44-47/352). At trial, the State produced 23 witnesses and 84 exhibits. Although Wills's pretrial proceedings took about a year and a half, it was not an unreasonable amount of time.

Moreover, Wills has not alleged any particular prejudice resulting from the delay in his trial. Under Louisiana law, the sole remedy for a violation of the Speedy Trial Act is pretrial release without bail. See La. C. Cr. P. art. 701. Wills has not

---

[2] Louisiana has adopted the four factors used in Barker. See State v. James, 394 So.2d 1197, 1200 (La. 1981).

alleged or shown how pretrial release would not have changed the outcome of his trial.

Wills has not carried his burden of proving his right to a speedy trial was violated and that the state courts' denial of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

### 4.    Wills's attorney did not err in failing to move to suppress the evidence seized from Wills's vehicle.

Wills contends his attorney erred in failing to seek to suppress the evidence seized from his vehicle, a holster, and argues it should have been included in the motion to suppress that was filed.  Wills contends his vehicle was impounded "in anticipation of a search warrant they never received."  Wills alleges that, without his consent, the police searched his vehicle and seized a holster that was admitted into evidence at trial without objection by Wills's counsel.  Wills contends the holster was important because it supported the State's theory that Wills had a gun that he used to shoot the victim, then he got rid of the gun but kept the holster.

Wills did not raise the underlying search and seizure claim on appeal.  The state courts summarily denied Wills's post-conviction ineffective assistance of counsel claim (Doc. 15-11, pp. 58-59/200; Doc. 15-12, p. 281/281; Doc. 15-13, p. 392/393). Therefore, this Court must determine what grounds could have supported the decision to deny relief on Wills's ineffective assistance of counsel claim.

The Fourth Amendment to the United States Constitution and article I, § 5, of the Louisiana Constitution afford protection against unreasonable searches and

seizures. See State v. Littleton, 407 So.2d 1208, 1210-11 (La. 1981). The Louisiana Supreme Court has stated the law is well settled that warrantless searches and seizures are *per se* unreasonable unless they fall within a limited number of well-delineated exceptions to the warrant requirement. See Littleton, 407 So.2d at 1210-11.

Both the United States Supreme Court and the Louisiana Supreme Court have recognized a true inventory search to be an exception to the warrant requirement.[3] Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. See Colorado v. Bertine, 479 U.S. 367, 372 (1987). The United States Supreme Court has noted that its cases accord deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody. See Bertine, 479 U.S. at 372. When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the vehicles' contents. See S. Dakota v. Opperman, 428 U.S. 364, 369–71 (1976).

A valid inventory search is conducted not on probable cause to secure evidence, but merely to inventory the vehicle's contents in order to safeguard them, as an incident to the vehicle's necessarily being taken into lawful police custody. State v. Carey, 499 So. 2d 283, 287 (La. App. 1st Cir. 1986). An inventory search may not be

---

[3] See Colorado v. Bertine, 479 U.S. 367, 370-71 (1987); State v. Jewell, 338 So. 2d 633, 638 (La. 1976).

used as a subterfuge for rummaging through the arrestee's vehicle without a warrant for the primary purpose of seizing evidence.  See Carey, 499 So. 2d at 287.

There are several factors which Louisiana courts have considered to be significant in determining whether a true inventory search has been conducted: (1) the vehicle could not have remained safely at or near the place it was stopped; (2) the search was not conducted in the field; (3) the tow truck was called before the search commenced; (4) formal impoundment procedures were followed; (5) the vehicle operator was asked if he consented to a search, if the car contained valuables, or if he would consent to the agency's failure to afford him the protection of an inventory search; (6) arrangements were made for someone designated by the operator to take possession or protective custody of the vehicle for him.  See Carey, 499 So.2d at 287.

Sergeant Duddy of the Shreveport Police Department testified that, after he investigated the crime scene, he went to Wills's residence, saw his vehicle parked in front of house, and "impounded" the vehicle (Doc. 15-8, pp. 100-01/257).  Sergeant Duddy later went to the impoundment bay to "take possession of the vehicle" that was "locked inside the processing bay until it could be searched later that day" (Doc. 258, p. 105/257).  Sergeant Duddy then testified briefly that Wills's vehicle was searched pursuant to his "consent" (Doc. 15-8, p. 102/257).  However, there was no evidence that Wills consented to a search, and Sergeant Duddy did not testify as to when and where Wills gave his consent to search.  An inventory of the vehicle is also not in the record.  Sergeant Duddy testified as to the holster he found stuck between the driver's seat and the center compartment of the vehicle (Doc. 15-8, p. 103/257).

16

It does not appear the State established either the consent exception or the impoundment exception to the warrant requirement.  However, even assuming Wills has shown his attorney erred in failing to object to the search of his vehicle and the introduction of the holster, Wills has not shown how he was prejudiced by its admission.  As both the State and Wills point out, the empty holster was redundant evidence in light of the fact that there were eyewitnesses who saw Wills shoot the victim.  Therefore, for purposes of the defense of manslaughter, if the admission of the holster into evidence was an error, it was harmless.

Since Wills has not shown prejudice arising from his attorney's failure to object to the search of his vehicle and seizure and introduction of the gun holster into evidence, Wills has not carried his burden of proving he had ineffective assistance of counsel.  Therefore, Wills has not shown there was no reasonable basis for the state courts to deny him relief on this claim.

> ### 5.    <u>Wills's right to confront witnesses against him was not violated when his attorney stipulated to perpetuation of Sergeant Duddy's testimony.</u>

Wills contends his attorney erred in stipulating to the State's motion to perpetuate Sergeant Duddy's testimony, in violation of his right to confront Sgt. Duddy.[4]  Wills did not appeal the issue at to introduction of only part of his statement at trial.   The state courts summarily denied Wills's post-conviction ineffective assistance of counsel claim (Doc. 15-11, pp. 58-59/200; Doc. 15-12, p. 281/281; Doc. 15-13, p. 392/393).

---

[4] Wills also alleges Sgt. Duddy testified as an expert.  However, Sgt. Duddy only testified as an investigating officer in the case.  He was not qualified as an expert.

Sgt. Duddy testified in a pretrial hearing, at which Wills and his attorney were present and afforded an opportunity to cross-examine Sgt. Duddy. Therefore, Wills's right to cross-examine Sgt. Duddy was not violated. Although Wills complains he was unaware the hearing would be held before he was taken there, so he did not have time to prepare, his attorney handled the cross-examination.

Wills also complains his attorney did not cross-examine Sgt. Duddy as to a cigarette lighter found in front of Wills's mother's home. Wills contends the lighter was his. However, Wills has not alleged how that line of questioning would have made any difference at trial and how he was prejudiced. Wills has not denied that he confronted the victim.

Wills has not carried his burden of proving his attorney erred, or that there was no reasonable basis for the state courts to deny him relief on this claim.

6.    <u>Wills contends his attorney erred in agreeing to excise two portions of Wills's recorded statement to the police.</u>

Wills contends his attorney erred in agreeing to excise the portions of his statement where he told the police he had an empty holster because he was on parole and had been convicted of a felony. Wills contends the excision of his statement violated his right under La. R.S. 15:450, which states in pertinent part that a confession sought to be used against anyone must be used in its entirety so the person may have the benefits of any explanation the whole statement may afford.

Wills did not raise the underlying issue of introduction of only part of his statement on appeal. The state courts summarily denied Wills's post-conviction

18

ineffective assistance of counsel claim (Doc. 15-11, pp. 58-59/200; Doc. 15-12, p. 281/281; Doc. 15-13, p. 392/393).

Mere violation of evidentiary rules by the state trial court does not in itself invoke habeas corpus relief. See Panzavecchia v. Wainwright, 658 F.2d 337, 340 (5th Cir. 1981). Thus, claims challenging the exclusion or inclusion of evidence based on state law do not afford a basis for federal habeas corpus relief. Federal habeas corpus review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law. In reviewing state court evidentiary rulings, the federal habeas court's role is limited to determining whether a trial judge's error is so extreme that it constituted a denial of fundamental fairness under the Due Process Clause. See Castillo v. Johnson, 141 F.3d 218, 222 (5th Cir.), cert. denied 524 U.S. 979 (1998).

Wills argues the prosecutor misled the jury by playing the part of the recorded statement where he asked Wills if he had a holster in his car to create the appearance of having a gun. Wills's explanation of the holster (that it was illegal for him to possess a gun because he was on parole and had a prior felony conviction) was not played.

Louisiana law generally prohibits the admission of "other crimes evidence," that is, evidence of criminal conduct uncharged in the subject indictment, with exceptions for proving identity, system, or res gestae. Robinson v. Whitley, 2 F.3d 562, 566 (5th Cir. 1993), cert. den, 510 U.S. 1167 (1994), citing State v. Prieur, 277 So.2d 126, 128 (La. 1973). Wills's attorney and the prosecutor informed the court

they had agreed and stipulated to excision of the two references to other crimes from Wills's recorded statement that had previously been admitted into evidence (Doc. 15-8, p. 10/257).

Wills cannot show prejudice from his attorney's agreement to present only part of his statement to the jury. The omitted portions were properly excluded as other crimes evidence. Whatever the jury inferred from Wills's possession of the holster was somewhat cumulative to the eyewitness testimony that Wills's had a gun and less prejudicial than hearing about his criminal history. Therefore, Wills cannot show any prejudice arising from his attorney's agreement to excise the portions of his statement that referred to evidence of other crimes.

Wills has not carried his burden of proving his attorney erred, or that there was no reasonable basis for the state courts to deny him relief on this claim.

> 7. **Wills's attorney did not fail to properly cross-examine the witnesses.**

Wills argues his attorney failed to properly cross-examine some witnesses: Zina Guster (the victim's mother); Sgt. Duddy; Tondra Johnson; Joe Johnson; Charmaine Williams; Aleana, Ellen, and Emma Johnson; Teresa Wills (Wills's wife); Sergeant Robinson;

The state courts summarily denied Wills's post-conviction ineffective assistance of counsel claims (Doc. 15-11, pp. 58-59/200; Doc. 15-12, p. 281/281; Doc. 15-13, p. 392/393).

Wills essentially complains that, when his attorney impeached Zina Guster, Zina failed to change her testimony.   However, Wills's attorney successfully impeached Zina's testimony.  Wills did not have ineffective assistance of counsel.

Wills also complains his attorney did not pose hypothetical questions to Sgt. Duddy after he testified that he did not see a "blood trail" at the crime scene (Doc. 15-7, pp. 73-74/77).   However, Sgt. Duddy was not an expert witness and such questioning would have been improper.

Wills contends his attorney failed to cross-examine Tondra Johnson about the inconsistencies in her testimony after the prosecutor refreshed her memory with a transcript copy of her grand jury testimony. However, the prosecutor asked Tondra about the inconsistencies in her testimony (Doc. 15-8, pp. 125-26/257).   Tondra initially testified at trial that she never saw Wills with a gun, but changed her testimony after the prosecutor "refreshed" her memory with a transcript of her grand jury testimony (Doc. 15-8, pp. 125-26/257).   Tondra then testified that she heard the shots, went outside, saw Wills standing over the victim (who was on the ground) with a gun in his hand, then he went to his truck, returned and picked up the victim, put the victim's body in a vacant lot across the street, got into his truck, and drove away (Doc. 15-8, pp. 126-27/257).  There were also other, less critical inconsistencies that both attorneys brought out (Doc. 15-8, pp. 127-38/257). Wills's attorney cross-examined Tondra concerning inconsistencies in her testimony.

Wills contends his attorney failed to cross-examine Joe Johnson, but admits his attorney asked Joe whether he had actually seen the shooting and that Joe

testified he had not (Doc. 15-8, pp. 125-26/257). Wills complains his attorney "had a duty to point out the inconsistencies in Joe's testimony." However, Joe testified he talked "Mimi" out of touching the victim's body, then he saw the victim's sister show up and try to "wake up" the victim (Doc. 15-8, pp. 127-38/257). The "inconsistencies" Wills points out are not actually inconsistencies. Moreover, Wills has not alleged specifically how he was prejudiced by those "inconsistencies."

Wills contends his attorney failed to properly cross-examine Charmaine Williams (Doc. 15-8, pp. 146/257). Williams contends his attorney failed to object to leading questions by the prosecutor when Williams testified he was an eye-witness to the incident, but Wills has not shown specifically how he was prejudiced.

Wills also contends his attorney failed to properly cross-examine Aleana Johnson (Wills's mother), Ellen Johnson (Wills's sister), and Emma Johnson (Wills's sister). Wills contends the witnesses attempted to testify in his favor, but his attorney would not allow them to do so. However, it was the prosecutor who impeached Aleana and Emma with their previous recorded statements (Doc. 15-8, pp. 185, 235-36 /257). Wills's attorney impeached Ellen with her prior statement (that she did not see the shooting) when she testified at trial that her brother shot the victim more than once (Doc. 15-8, pp. 209-210/257). Wills's attorney pursued Ellen's inconsistent statements at trial (Doc. 15-8, pp. 222-23/257).

Wills argues his attorney was ineffective for not invoking the spousal privilege and for failing to properly cross-examine Teresa Wills (Wills's wife). At trial, a problem arose when Teresa began to testify about a phone conversation she had with

Wills after the shooting (Doc. 15-8, pp. 248/257).  Teresa had not revealed that conversation to anyone before trial.  After Teresa explained what she was going to say outside of the presence of the jury, the attorneys agreed to allow her to testify to the conversation without objection and without invoking the spousal privilege (Doc. 15-8, pp. 249-252, 253/257).  Although Wills contends his attorney knew what Teresa was going to say from a previous interview, Wills has not shown any reason why his attorney should have objected or invoked the spousal privilege with regard to that testimony.  The testimony was favorable to Wills because it showed he believed he acted in self-defense.

Wills also contends his attorney should have objected when the prosecutor "misled" and "confused" Teresa with leading questions and mischaracterized her answers.  However, the question concerning whether Teresa's gun was kept in the holster was clear, and Teresa clearly said she did not keep the gun in the holster (Doc. 15-8, pp. 246/257).  Wills had not shown any prejudice.

Wills argues his attorney failed to cross-examine Evony Guster (the victim's sister) (Doc. 15-8, p. 44/257) and Officer Kite (Doc. 15-9, p. 277/290).  Wills does not allege what questions his attorney should have asked, what information he would have elicited, and how it would have changed the outcome of his trial.

Wills contend his attorney failed to properly cross-examine Sergeant Robinson (Doc. 15-9, p. 45/290).  Wills contends that, when Sergeant Robinson testified he located Wills's address in departmental records, Wills's attorney should have objected to the "other crime" evidence.  The fact that the police department has a record of

23

Wills's address does not constitute evidence of other crimes, since there was no testimony as to prior charges or convictions.[5]    Therefore, Wills has not carried his burden of proving he was denied the effective assistance of counsel or that there was no reasonable basis for the state courts to deny him relief on this claim.

### 8.    Wills's attorney did not deny Wills his right to testify.

Wills contends he was effectively denied his right to testify in his defense because his attorney failed to prepare him for trial.  Wills admits that, when his attorney informed the court that Wills would not be testifying and the court asked him if that was true, he did not deny it because he did not know what his attorney was doing.  Wills also contends he did not testify became his attorney was working with the prosecutor.   Wills argues that, if his attorney did not believe in his defense (of self-defense), he should have withdrawn from the case.

As previously discussed, Wills did not have a viable defense of self-defense. There were eye-witnesses to the offense and the victim was unarmed.   Wills's attorney presented the best defense available, that of manslaughter, and clearly represented Wills's interests, not those of the state.

Wills had an opportunity to testify and did not refute his attorney's statement and tell the court he wanted to testify.  Moreover, Wills has not shown this Court what he would have testified to and how it would have made a difference to the outcome of the trial.  Wills has not carried his burden of proving he was denied the

---

[5] Moreover, evidence of other crimes may be admitted in certain instances.  See Robinson v. Whitley, 2 F.3d 562, 566 (5th Cir. 1993), cert. den, 510 U.S. 1167 (1994) (citing State v. Prieur, 277 So.2d 126, 128 (La. 1973)).

effective assistance of counsel or that there was no reasonable basis for the state courts to deny him relief on this claim.

### 9.   Wills's family was properly sequestered.

Wills contend his attorney was ineffective for failing to request that his family be released from the rule of sequestration so they could support him in court. However, the prosecutor (and defense counsel) requested sequestration (Doc. 15-8, p. 8/257), so the witnesses were properly sequestered until the end of trial, pursuant to La. C.E. art. 615(A).[6]  In any event, this is a matter of state procedural law and is not cognizable in habeas corpus.  See Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998), cert. den., 524 U.S. 947 (1998) (citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).

Wills has not carried his burden of proving he was denied the effective assistance of counsel or that there was no reasonable basis for the state courts to deny him relief on this claim.

### 10.   Wills's counsel made appropriate objections at trial.

Wills contends his attorney "failed to object to anything at trial," which rendered his trial unfair.  That is simply not true.  Defense counsel made objections when necessary, cross-examined witnesses thoroughly, and presented the best defense he could on Wills's behalf.  Wills has not shown his attorney committed errors which prejudiced him at trial.  Therefore, there is not a "cumulative error" effect to consider.  Wills has not carried his burden of proving he was denied the effective

---

[6] Article 615(B) provides the victim's family and police officers are released from sequestration after they testify.

assistance of counsel or that there was no reasonable basis for the state courts to deny him relief on this claim.

### B.    Wills did not carry his burden of proving prosecutorial misconduct.

Next, Wills contends his trial was rendered fundamentally unfair by prosecutorial misconduct.  Wills alleges the prosecutor: (1) gave an opening statement that improperly included his personal opinion that the victim had an undiagnosed mental condition; (2) improperly elicited sympathy for the victim's mother; (3) failed to correct false testimony from Sgt. Duddy and Joe Johnson; (4) mischaracterized Teresa Will' testimony; (5) misstated the law as to negligent homicide to the jury; (6) misrepresented Wills's actions; and (7) appealed to the jury's emotions in his closing argument.   Wills contends he was denied a fair trial.

The state courts denied Wills's claim on post-conviction relief, finding he had not shown any improper comments were made or that any such statement contributed to the verdict (Doc. 15-11, pp. 59-60/200).[7]

Prosecutorial misbehavior, alone, does not constitute a wrong of constitutional dimensions, and does not require a new trial.  Smith v. Phillips, 455 U.S. 209, 221 (1982).  Claims of prosecutorial-misconduct are evaluated in two steps: (1) determine whether the prosecutor made an improper remark; and, if he did, (2) determine whether the defendant suffered prejudice. See Trottie v. Stephens, 720 F.3d 231, 253

---

[7] Although the state courts noted that defense counsel failed to make any objections to prosecutorial misconduct, they decided the claim on the merits and did not rely on that procedural bar.  (Doc. 15-11, pp. 59-60/200).  To prevent federal habeas review, a state procedural bar must be independent of the merits of the federal claim and adequate.  See Lott v. Hargett, 80 F.3d 161, 164 (5th Cir. 1996); see also Coleman v. Thompson, 501 U.S. 722, 750 (1991).

(5th Cir. 2013), cert den., 720 U.S. 231 (2013), citing United States v. Ebron, 683 F.3d 105, 140 (5th Cir. 2012), cert. den., 134 S.Ct. 512 (U.S. 2013). The prejudice step of the inquiry sets a high bar. Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected. See Trottie, 720 F.3d at 253 (citing Ebron, 683 F.3d at 140); see also Parker v. Matthews, 567 U.S. 37, 45 (2012). The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict. See Trottie, 720 F.3d at 253 (citing Ebron, 683 F.3d at 140). In deciding whether serious doubt infects the verdict, we look to three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. See id.

Wills contends the prosecutor gave an opening statement that improperly included his personal opinion that the victim had an undiagnosed mental condition. The prosecutor referred to the victim's "eccentricities," stated he might have had an undiagnosed mental condition that was worsening with age, and that the victim's mother had consulted the coroner's office about available treatment (Doc. 15-8, p. 16/257). Zina Guster testified in accordance with that statement (Doc. 15-8, pp. 39-40/257). Therefore, the prosecutor did not offer a personal opinion, and there was no prosecutorial misconduct in this respect.

Wills contends the prosecutor improperly elicited sympathy for the victim's mother (Doc. 15-8, p. 16/257). Emotive appeals are appropriate in opening and closing arguments and are not prosecutorial misconduct.

Wills contends the prosecutor failed to correct false testimony from Sgt. Duddy and Joe Johnson. Wills's allegation that they gave false testimony is not supported by the evidence. There is no evidence that the prosecutor knowingly allowed false testimony to be given.[8]

Wills contends the prosecutor mischaracterized Teresa Wills's testimony as to the gun and the holster, and tried to confuse her. However, as discussed above, the prosecutor's questions and Teresa's answers were clear. There was no prosecutorial misconduct in the questioning of Teresa Wills.

Wills next contends the prosecutor misstated the law as to negligent homicide in his closing argument when he said that negligent homicide involves an accident. Since that is a correct definition of negligent homicide in part, and since negligent homicide was not involved in this case, there was no prosecutorial misconduct. See La. R.S. 14:32.[9]

---

[8] In order for an allegation of perjured testimony to constitute a due process violation, a petitioner must show the prosecution knowingly presented materially false evidence to the jury. Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990) (citing United States v. Martinez-Mercado, 888 F.2d 1484, 1492 (5th Cir. 1989)). Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, a new trial is required only when the tainted evidence was material to the case. Smith, 455 U.S. at 220 n.10.

[9] La. R.S. 14:32, Negligent homicide:
    A. Negligent homicide is either of the following:
        (1) The killing of a human being by criminal negligence.
        (2) The killing of a human being by a dog or other animal when the owner is reckless and criminally negligent in confining or restraining the dog or other animal.

La. R.S. 14:12, Criminal negligence:
    Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

Finally, Wills contends the prosecutor misrepresented Wills's actions. However, the prosecutor did nothing more than present the State's theory of the offense based on the evidence presented.  That is not prosecutorial misconduct.

Wills has not carried his burden of proving there was prosecutorial misconduct that rendered his trial fundamentally unfair and that the state courts' denial of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

### C.  Wills's post-conviction relief procedural issues do not state claims for federal habeas relief.

Wills contends the state district court erred when it failed to allow Wills to supplement his application for post-conviction relief and summarily denied his application for post-conviction relief in violation of the Fifth, Sixth, and Fourteenth Amendments.

As he notes in his brief (Doc. 1-3, p. 51-52/200), Wills was ultimately allowed to supplement his application for post-conviction relief, and it was denied (Doc. 15-11, p. 75/200; Doc. 15-12, p. 252/281; Doc. 15-13, p. 393/394).

As noted above, the state courts summarily dismissed some of Wills post-conviction claims.  Section 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits.  When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  See Richter, 562 U.S. at 99.

Therefore, Wills has not stated a federal constitutional claim for habeas relief pursuant to § 2254.

## III.  Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Wills's § 2254 habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** See 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS ORDERED AND SIGNED in Chambers at Alexandria, Louisiana on this   17th  day of May, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge